# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: June 7, 2022

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * | | |
| NAILA HANIF, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | No. 19-367V |
| | * | |
| v. | * | Special Master Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Dismissal Decision; Failure to Prosecute. |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * * | | |

Bridget C. McCullough, Muller Brazil, LLP, Dresher, PA, for Petitioner.
Debra Begley, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION[1]

## I.      INTRODUCTION

On March 11, 2019, Naila Hanif ("Petitioner") filed a petition for compensation in the National Vaccine Injury Program, 42 U.S.C. §§ 300aa-1 to 34 et seq. (2012).[2] Petitioner alleged that she suffered transverse myelitis ("TM") as a result of a meningococcal conjugate vaccination on January 5, 2017. Petition at Preamble (ECF No. 1). On March 2, 2020, Respondent filed his Rule 4(c) Report arguing against compensation, stating "this case is not

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

appropriate for compensation under the terms of the Act."  Respondent's Report ("Resp. Rept.")
at 2 (ECF No. 25).

Based on all the reasons set forth below and in the Show Cause Order dated March 10,
2022, and for failure to comply with the Show Cause Order, the undersigned dismisses this case
for failure to prosecute and insufficient proof.

II.      **PROCEDURAL HISTORY**

Petitioner filed a petition with supporting medical records on March 11, 2019.  Petition;
Petitioner's Exhibits ("Pet. Exs.") 1-11.  Petitioner filed additional medical records throughout
2019 and 2020.  Pet. Exs. 12-19.  On August 20, 2019, Petitioner filed a joint status report stating
Respondent requested Petitioner file "untranslated as well as certified translated records from the
hospitals in Saudi Arabia at which [P]etitioner was treated."  Joint Status Rept., filed Aug. 30,
2019 (ECF No. 12).

Despite issues obtaining translated records from Saudi Arabia, Respondent filed
Respondent's Rule 4(c) Report on March 2, 2020.  Resp. Rept.  In the Report, Respondent
indicated that it was not clear that petitioner suffered from TM.  Resp. Rept. at 12.  As
Respondent explained, Federal Circuit precedent establishes that in certain cases, it is appropriate
to determine the nature of an injury before engaging in the Althen analysis.  Broekelschen v.
Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010); see also Althen v. Sec'y
of Health & Hum. Servs., 418 F.3d 1274, 1280 (Fed. Cir. 2005).  Since "each prong of the
Althen test is decided relative to the injury[,]" determining facts relating to the claimed injury
can be significant in a case like this, where Petitioner's diagnosis is not clear.  Broekelschen, 618
F.3d at 1339.  Respondent also reported in his Report that Petitioner had not filed authenticated
records documenting care and treatment in Saudi Arabia, and that the records that have been
filed from Saudi Arabia contain numerous errors and inconsistencies, raising serious questions as
to authenticity and reliability.  Resp. Rept. at 13-14.  Lastly, Respondent argued that none of the
records filed supported a diagnosis of TM.  Id. at 14-15.

Thereafter, Petitioner was directed to file additional evidence and medical records in
support of her claim, including medical records from King Fahad Hospital in Saudi Arabia.
Order dated Mar. 3, 2020 (ECF No. 26).  Given Petitioner's difficulties obtaining the records, a
status conference was held on May 12, 2020.  Order dated May 13, 2020 (ECF No. 28).
Petitioner was directed to research ways to obtain the records.  Id. at 1-2.  On June 11, 2020,
Petitioner filed a status report.  Pet. Status Rept., filed June 11, 2020 (ECF No. 29).  Petitioner's
counsel reported she spoke with a representative from Ancillary Legal Corporation regarding
obtaining Petitioner's medical records from Saudi Arabia, and was informed that Saudi Arabia is
not part of the Hague Convention governing international service of process.  Id. at 1.  When
countries are not part of the Hague Convention, attempts to collect medical records are made
through the State Department; however, given the diplomatic relationship between the United
States and Saudi Arabia, Petitioner's counsel was advised that this avenue was unlikely to be
successful.  Id.  Counsel was advised that the best chance for success would be through a law
firm in Saudi Arabia.  Id.  The undersigned directed Petitioner to look into whether a law firm in
Saudi Arabia could obtain Petitioner's medical records.  Order dated June 11, 2020 (ECF No.

31).  In August 2020, Petitioner reported that she was able to retain a law firm in Saudi Arabia to assist in collection of the records.  See Order dated Aug. 10, 2020 (ECF No. 36).

On May 24, 2021, Petitioner filed records from King Fahad Hospital.  Pet. Ex. 20.  Petitioner reported these records were "largely the same as those previously filed, with the exception of biographical data that was corrected to address Respondent's concerns."  Pet. Status Rept., filed May 24, 2021 (ECF No. 46).  Petitioner requested additional time to obtain a full set of medical records from King Fahad Hospital, which the undersigned granted.  Order dated May 25, 2021 (ECF No. 47).

On October 11 and 12, 2021, petitioner filed medical records, an affidavit of counsel, and other evidence.  Pet. Exs. 21-24.  Petitioner filed a motion to stay the case on October 12, 2021, requesting a stay of 90 days to allow for additional time for Petitioner to attempt to collect her medical records from Saudi Arabia.  Motion to Stay the Case, filed Oct. 12, 2021 (ECF No. 55).  Petitioner's request was granted.  Order dated Oct. 28, 2021 (ECF No. 56).

A status conference was held on March 10, 2022 to discuss the ongoing issues.  Order dated Mar. 10, 2022 (ECF No. 58).  The undersigned explained that after reviewing all of the evidence, including Petitioner's medical records and MRI reports, it appeared that although her physicians considered the diagnosis of TM, after evaluation, they concluded that there was insufficient evidence to show that Petitioner suffered from TM.  Id. at 1.

The undersigned issued an Order to Show Cause on March 10, 2022.  Order to Show Cause dated Mar. 10, 2022 (ECF No. 59).  The Order to Show Cause requested Petitioner file complete medical records from Saudi Arabia that show evidence to support she suffered from TM or any similar illness.  Id. at 3.  To date, Petitioner has not filed evidence to support she suffered from TM or any similar illness.

This matter is ripe for adjudication.

## III.    RELEVANT MEDICAL HISTORY

Petitioner was born February 15, 1976.  Pet. Ex. 1 at 1.  She was forty years old at the time of vaccination, and her past medical history was significant for asthma, a cardiac catheterization and angiography, hypertension, and mitral valve prolapse.  Pet. Ex. 12 at 2, 5, 8; Pet. Ex. 6 at 5-6.

Petitioner received a meningococcal (Menactra) vaccination in her right arm on January 5, 2017.  Pet. Ex. 1 at 2.  On January 14, 2017, Petitioner presented to American Family Urgent Care due to fatigue, full body pain, and numbness.  Pet. Ex. 10 at 2.  Dr. Michael Lee diagnosed "urinary frequency," likely a urinary tract infection, "myalgia," and "adverse effect of other vaccines and biological substances, initial encounter."[3]  Id. at 5.  Subsequently, Petitioner traveled to Saudi Arabia on a trip.  Pet. Ex. 11 at ¶ 6.

---

[3] There is no explanation as to what was meant by the reference to the "adverse effect of other vaccines and biological substances."

Petitioner was admitted to the King Fahad Hospital in Madinah, Saudi Arabia on January 24, 2017.  Pet. Ex. 2 at 1.  A letter from Dr. Majid Bakheet dated January 27, 2017 noted a diagnosis of "acute [TM]" and stated, "patient [] is not known to have any medical problems before admitted in our hospital[,] complain[s] of urinary and fecal [incontinence] with sensory impairment and mild lower limb[] weakness for one week.  She received her meningococcal vaccine 10 days before her symptoms started."  Id.  Dr. Bakheet noted an "MRI of whole spine done with contrast showed inflammation of the whole spine.  [Lumbar puncture] done [] was normal except for protein which was 78 mg."  Id. at 1-2.  She received IVIG for two days.  Id. at 1.

Records from King Fahad Hospital showed Petitioner's discharge diagnosis was TM.  Pet. Ex. 2 at 3.  Radiology department reports dated January 19, 2017 showing results for the dorso-lumbar spine and cervical spine presented findings of "high signal intensity T2 weighted image in cervical and thoracic spine with no significant enhancement after gadolinium injection."  Id. at 5-6.  "Normal height and shape of the examined vertebral bodies with no spondylolysis or spondylolisthesis.  Normal appearance of intervertebral discs with no significant disk bulge or disk herniation.  Normal pre and paravertebral soft tissues."  Id.  Impression was "suggestive of inflammatory myelopathy."  Id.

On February 1, 2017, after returning from Saudi Arabia, Petitioner saw neurologist, Dr. Jagga Alluri.  Pet. Ex. 4 at 2.  History provided by Petitioner stated she received the meningitis vaccination and one to two days later "started to experience neck stiffness, high fevers, . . . and lower extremity weakness and tingling."  Id.  She reported she had a urinary catheter, trouble with bowel movements, and had difficulty walking.  Id.  Dr. Alluri assessed Petitioner with TM and hypertension.  Id.

Petitioner returned to Dr. Alluri on February 8, 2017, after an MRI of the cervical spine done on February 6.  Pet. Ex. 4 at 4.  After reviewing the results of the MRI, Dr. Alluri noted an "[u]nremarkable cervical spinal cord" with no listhesis, no cord deformity, no central canal stenosis, and no foraminal stenosis.  Id.  There was evidence of degenerative disc disease at C3-4, C4-5 and C5-6 and a small central disc herniation at C3-4 and right-sided disc osteophyte complexes at C4-5 and C5-6.  Id.  The MRI impression was "[n]o evidence for demyelinating disease."  Id. at 17.  Dr. Alluri performed electromyography ("EMG") and nerve conduction velocity ("NCV") testing and found left carpal tunnel syndrome and right leg L5 radiculopathy.  Id. at 4, 21-22.  However, there was no demyelinating neuropathy.  Id. at 4.  Assessment was TM improving and no demyelinating disease.  Id.  His examination revealed no neurological deficits and Petitioner exhibited normal strength, sensation, and reflexes.  Id.

Petitioner had a repeat MRI on February 8, 2017, and followed up with Dr. Alluri on March 16, 2017.  Pet. Ex. 4 at 6, 26.  Dr. Alluri again noted the MRI showed no neuropathy and no demyelinating neuropathy.  Id. at 6.  He planned to order another MRI and referred Petitioner to rheumatology.  Id. at 7.  On April 4, 2017, MRI of the lumbar spine without contrast showed mild multilevel degenerative disc disease with a left-sided asymmetric disc bulge.  Id. at 29.  At Petitioner's follow ups throughout 2017 and 2018, Dr. Alluri's assessment remained relatively the same.  Id. at 7-15.

4

Petitioner saw Dr. Neil Ferrara on May 23, 2017 for an initial gastrointestinal evaluation due to five months of constipation, bloating, and discomfort.  Pet. Ex. 14 at 10.  Dr. Ferrara assessed chronic constipation and recommended further testing and follow up in two weeks.  Id. at 12.

On May 26, 2017, Petitioner sought care with urologist, Dr. Simon Hall.  Pet. Ex. 9 at 6. Petitioner stated that she first developed difficulty voiding associated with numbness in the pelvic area during her trip to Saudi Arabia.  Id.  A urine culture taken at that time was negative. Id. at 7.

On July 20, 2017, Petitioner presented to neuro-ophthalmologist, Dr. Howard Pomeranz, on referral from Dr. Alluri due to photosensitivity.  Pet. Ex. 7 at 35.  Dr. Pomeranz stated Petitioner had a "[n]ormal neuro-ophthalmologic examination without evidence of uveitis."  Id. Petitioner's "photosensitivity is secondary to meningitis and not due to any problem in the eyes themselves."  Id.

On December 20, 2017, Petitioner presented for a neurology consult with Dr. Daniel Cohen.  Pet. Ex. 3 at 1.  Dr. Cohen assessed Petitioner with "[s]tatus post episode of [TM]."  Id. at 2.  However, he noted "[h]er examination [was] unremarkable."  Id.

On December 21, 2017, Petitioner saw Dr. Raisa Bakshiyev, pain management specialist, for numbness throughout her entire body.  Pet. Ex. 15 at 99.  Petitioner reported stiffness in her neck, shoulders, and down her back, and difficulty seeing in bright light.  Id.  Dr. Bakshiyev assessed Petitioner with Guillain-Barré syndrome ("GBS") following vaccination, peripheral neuropathy, and myotonia acquisita.  Id. at 101.  Dr. Bakshiyev wrote that Petitioner's symptoms "seem[] like a [GBS] event rather than a [TM] [event]."  Id.

Petitioner was admitted to Northwell Health Plainview Hospital on December 26, 2017 due to complaints of weakness and pain and saw neurologist Dr. Birendra Trivedi.  Pet. Ex. 5 at 4, 124.  Dr. Trivedi reported that Petitioner's previous MRI of the brain and spine showed no evidence of myelitis.  Id.  Physical examination revealed "mild weakness of upper and lower extremity in the range of 4 to 4+/5."  Id. at 4-5.  Dr. Trivedi recommended a repeat cervical and thoracic MRI with and without contrast, as well as a lumbar MRI.  Id. at 5.

The MRIs of the lumbar, thoracic, and cervical spine without contrast were performed on December 16, 2017.  Pet. Ex. 5 at 22, 26, 28.  The impression for the lumbar spine found, "[n]o acute findings.  Normal appearance of the distal spinal cord and conus.  Mild degenerative disc disease with facet arthropathy, no significant canal or neural foraminal stenosis."  Id. at 23.  The thoracic spine MRI was "unremarkable" with no spinal canal stenosis or acute fracture.  Id. at 26. There was "[n]o intramedullary signal abnormality, cord edema[,] or expansion."  Id. at 27. Cervical MRI showed "[m]ultilevel cervical degenerative disc disease with mild canal stenosis at C3-4 and C4-5."  Id. at 29.  The MRIs did "not have the typical appearance of [TM]."  Id. at 157.

On December 27, 2017, Petitioner had a consultation with infectious disease specialist, Dr. Paul Zelenetz.  Pet. Ex. 5 at 212-13.  Dr. Zelenetz stated the findings from King Fahad

Hospital make "no sense in the context of [TM]." Id. at 212. Additionally, Dr. Zelenetz stated if "her symptoms began within hours after vaccination" it would be "difficult to attribute her symptom complex to the vaccine." Id. He concluded, "I don't think we have a proven diagnosis of TV myelitis, and as such positive test results sent in the workup for such have a high likelihood of being false positives." Id. at 213. There was no "clear diagnosis to explain symptoms." Id. Petitioner's brain MRI was performed on December 28, 2017. Id. at 24. Results were normal. Id. Petitioner was subsequently discharged from Northwell Health Plainview Hospital on December 28 with the principal diagnosis of weakness and a recommendation to see a rheumatologist. Id. at 215.

Petitioner presented to Dr. Joseph Mosak, a rheumatologist, on January 5, 2018. Pet. Ex. 7 at 16. Dr. Mosak noted that Petitioner was "reportedly diagnosed with [TM], though no evidence of this on recent MRI[]s of the entire spine. She was also found to have a positive ANA." Id. Dr. Mosak ordered additional bloodwork, including serologies. Id. at 17.

Dr. Bakshiyev performed an EMG on January 12, 2018 that revealed "mostly normal electrodiagnostic examination." Pet. Ex. 15 at 78. "There is evidence of reinnervation of the peroneal division of the sciatic nerve." Id. "There is no evidence of myotonia based on today's EMG findings." Id.

Petitioner followed up with Dr. Mosak on January 19, 2018. Pet. Ex. 7 at 2. Dr. Mosak opined, "[Petitioner's] symptoms seem most consistent with a neurologic etiology, though recent MRIs of the spine and EMG of the [lower extremities] were unremarkable." Id. at 4. Dr. Mosak ordered an X-ray of the bilateral hips and pelvis due to Petitioner's severe pain in her hips. Id. at 4-6. "No fracture-subluxation [was] noted." Id. at 6. X-rays of Petitioner's sacroiliac joints and sacrococcyx were normal. Id. at 8-10.

During Petitioner's follow up appointment with Dr. Bakshiyev on September 6, 2018, Dr. Bakshiyev indicated Petitioner had abdominal bloating and peripheral neuropathy. Pet. Ex. 15 at 16.

On September 13, 2018, Petitioner saw Dr. Philip Ragone, a neurologist. Pet. Ex. 12 at 21. Dr. Ragone assessed her history of symptoms as "consistent with acute disseminated encephalomyelitis" ("ADEM"). Id. at 24. He ordered further testing. Id. Petitioner followed up with Dr. Ragone on October 23, 2018. Id. at 25. He noted Petitioner "suffered a bout of myelitis possibly postvaccinal in etiology in January 2017." Id. at 27. Petitioner returned to Dr. Ragone on December 21, 2018, after undergoing updated imaging. Pet. Ex. 13 at 6. "MRI of the brain was unremarkable. MRI of the cervical and thoracic spine revealed a punctate area of T2 signal hyperintensity." Id. Dr. Ragone recommended additional analysis to "assess for an ongoing immunologic disorder." Id. at 9. By March 5, 2019, Dr. Ragone noted that Petitioner's presentation may have been consistent with ADEM. Id. at 2.

No additional records have been filed.

## IV.    LEGAL STANDARDS AND ANALYSIS

When a Petitioner fails to comply with Court orders to prosecute her case, the court may dismiss the case. Sapharas v. Sec'y of Health & Hum. Servs., 35 Fed. Cl. 503 (1996); Tsekouras v. Sec'y of Health & Hum. Servs., 26 Cl. Ct. 439 (1992), aff'd, 991 F.2d 819 (Fed. Cir. 1993); Vaccine Rule 21(c); see also Claude E. Atkins Enters., Inc. v. United States, 889 F.2d 1180, 1183 (Fed. Cir. 1990) (affirming dismissal of case for failure to prosecute for counsel's failure to submit pre-trial memorandum); Adkins v. United States, 816 F.2d 1580, 1583 (Fed. Cir. 1987) (affirming dismissal of cases for failure of party to respond to discovery requests).

The undersigned first requested that Petitioner file additional evidence and medical records in support of her claim, including medical records from King Fahad Hospital in Saudi Arabia on March 3, 2020. The undersigned granted multiple motions for extension of time and a stay of the case throughout 2020, 2021, and 2022 so that Petitioner could file evidence to support her claim. During a status conference on March 10, 2022 to discuss the ongoing issues, the undersigned explained that after reviewing all of the evidence, including Petitioner's medical records and MRI reports, Petitioner presented insufficient evidence to show that she suffered from TM. The undersigned issued an Order to Show Cause on March 10, 2022, requesting Petitioner to file evidence to support she suffered from TM or any similar illness. However, Petitioner has not filed any additional evidence. Petitioner's failure to file any response to the Order to Show Cause indicates a disinterest in pursuing the claim. Thus, the undersigned finds it appropriate to dismiss this case for failure to prosecute.

Additionally, to receive compensation under the Act, a petitioner must prove either (1) that she suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of her vaccinations, or (2) that she suffered an injury that was actually caused by a vaccine. See §§ 11(c)(1), 13(a)(1)(A).

The undersigned finds Petitioner has not provided preponderant evidence of a vaccine-related injury. First, Petitioner's multiple MRI studies do not support a diagnosis of TM. The January 19, 2017 MRIs that Petitioner filed from Saudi Arabia do not show enhancement suggestive of inflammatory demyelinating myelopathy. Pet. Ex. 2 at 5-8. On February 6, 2017, Petitioner underwent a brain MRI that showed "[n]o evidence for demyelinating disease." Pet. Ex. 4 at 17. That same day, Petitioner underwent a cervical spine MRI. Id. at 19-20. The MRI revealed unremarkable cervical spinal cord, no listhesis, degenerative disc disease, small central disc herniation, no cord deformity, no central canal stenosis, and no foraminal stenosis. Id. at 20. On February 8, 2017, Petitioner underwent additional MRIs. Id. at 26-27, 31-32. Petitioner's thoracic spine MRI revealed "[m]ultilevel degenerative disc and facet changes" but "[n]o evidence of cord edema or abnormal cord enhancement." Id. at 26. Petitioner's lumbar spine MRI revealed "[m]ultilevel degenerative disc and facet changes" and "[m]ild canal narrowing L1-L2." Id. at 32. In summary, the MRI reports show degenerative disc disease, but no abnormalities that have been interpreted to be consistent with TM.

Second, while Petitioner's treating neurologists noted Petitioner's reports of her past history of TM, they did not diagnose petitioner with TM after evaluation. Petitioner was evaluated by Dr. Alluri shortly after she returned from Saudi Arabia, and the imaging studies showed no evidence of TM or demyelinating neuropathy. An EMG only showed evidence of left-handed carpal tunnel syndrome and L5-radiculopathy. Pet. Ex. 4 at 3-4. His examination

revealed no neurological deficits and Petitioner exhibited normal strength, sensation, and reflexes.  Id. at 4.

Petitioner was also evaluated by Dr. Cohen, whose neurological examination did not reveal any neurological deficits.  Pet. Ex. 3 at 1-2.  A third neurologist, Dr. Trivedi, evaluated Petitioner in December 2017, and found only "mild weakness of upper and lower extremity in the range of 4 to 4+/5" on physical examination.  Pet. Ex. 5 at 4-5.  MRIs were again ordered. Id. at 5.  The MRIs did not reveal evidence of TM.  Id. at 22-24.  Lastly, Petitioner was evaluated by Dr. Ragone in 2018, and he did not diagnose Petitioner with TM.  Pet. Ex. 12 at 21-28; Pet. Ex. 13 at 6-9.

Third, an infectious disease specialist did not find support for a diagnosis of TM.  Dr. Zelenetz concluded, "I don't think we have a proven diagnosis of [TM]," and he suggested that any prior testing suggesting TM may have been a "false positive."  Pet. Ex. 5 at 212-13.

Other providers, Drs. Bakshiyev and Ragone, questioned whether Petitioner's reported history could be consistent with other conditions.  On December 21, 2017, Dr. Bakshiyev, a pain specialist, noted that Petitioner's initial event was more likely GBS.  Pet. Ex. 15 at 101.  By March 5, 2019, more than two years post-vaccination, Dr. Ragone suggested that Petitioner's history may have been consistent with ADEM.  Pet. Ex. 13 at 2.  However, these opinions were not given in temporal association with the vaccination at issue.  Further, these possible differential diagnoses do not appear to be supported by the medical records issued more close in time with vaccination.

The undersigned expresses her sympathy for Petitioner and the ordeal she went through, but unfortunately the case cannot proceed without proof of diagnosis and causation.

**Thus, this case is dismissed for failure to prosecute and for insufficient proof.  The Clerk of Court shall enter judgment accordingly.**

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Special Master

8